IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 24, 2021 Session

## ANGELA MONTGOMERY v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Rutherford County**
**Nos. 80091, 69052   Royce Taylor, Judge**

_____

**No. M2020-00427-CCA-R3-PC**

_____

The Petitioner, Angela Montgomery, was convicted in the Rutherford County Circuit Court of six counts of rape of a child and received an effective sentence of forty years in confinement to be served at one hundred percent. After this court affirmed the Petitioner's convictions, she filed a petition for post-conviction relief, claiming that she received the ineffective assistance of trial counsel. The post-conviction court held an evidentiary hearing and granted relief. In this appeal by the State, the State contends for the first time that the post-conviction court lacked jurisdiction to consider the petition on its merits because the petition was untimely and that the post-conviction court incorrectly determined that the Petitioner received the ineffective assistance of trial counsel. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the case should be remanded to the post-conviction court to afford the Petitioner an opportunity to show whether the limitations period for filing the petition should be tolled based on due process concerns. Accordingly, the case is remanded to the post-conviction court for an evidentiary hearing on that issue.

**Tenn. R. App. P. 3 Appeal as of Right; Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Hugh Ammerman, Assistant District Attorney General, for the appellant, State of Tennessee.

John C. Taylor, Murfreesboro, Tennessee, for the appellee, Angela Montgomery.

## OPINION

## I.  Factual Background

In December 2012, the Rutherford County Grand Jury returned a forty-count indictment, charging the Petitioner with the following offenses: six counts of rape of a child in which the alleged victim was her son and eldest child, A.W.;[1] six counts of rape in which the alleged victim was A.W.; one count of coercing or influencing a witness, A.W.; twelve counts of rape of a child in which the alleged victim was her daughter and youngest child, A.V.W; twelve counts of incest in which the alleged victim was A.V.W.; one count of coercing or influencing a witness, A.V.W.; one count of rape of a child in which the alleged victim was her son, J.W.; and one count of rape of a child in which the alleged victim was her son, M.W.[2] Before trial, the parties agreed that the Petitioner would be tried separately for each victim and that she would be tried first for the charges involving A.W. Her trial began on March 10, 2015. Prior to voir dire, the State entered a nolle prosequi for the charges of rape of A.W. and coercion of A.W. The Petitioner proceeded to trial on the six remaining counts of rape of a child.

At trial, the then twenty-six-year-old victim testified that he was born in 1989; that he turned thirteen years old in 2002; and that he had three younger siblings: M.W., who was born in 1991; J.W., who was born with Down Syndrome in 1993; and A.V.W., who was born in 1996. In 1996, the victim's father and the Petitioner began divorce proceedings. From 1999 to 2002, the victim and his brothers lived with their father but stayed with the Petitioner "every other weekend." A.V.W., who was just three years old in 1999, lived with the Petitioner. The victim said that during that period of time, the Petitioner sexually abused him, and he described six incidents of sexual penetration. See State v. Angela Montgomery, No. M2016-00459-CCA-R3-CD, 2017 WL 3835962, at *3-5 (Tenn. Crim. App. at Nashville, Sept. 1, 2017). Specifically, the victim testified about the Petitioner's having him put his fingers into her vagina on three separate occasions, performing fellatio on him on two separate occasions, and putting the tip of his penis into her vagina on one occasion. See id. The abuse began when the victim brought home a permission slip for a sexual education class at his elementary school. Id. The Petitioner told the victim that she was teaching him to have sex so that he would "'know what sex is and how to have an adult relationship.'" Id. at *6. The victim believed the Petitioner and thought "'everybody [went] through this.'" Id. The victim said that aside from the sexual abuse, the Petitioner was a "'great mom.'" Id. at *5.

The victim testified that he told his stepmother about the abuse and that the Department of Children's Services (DCS) began an investigation. Id. at *6. The victim told DCS counselors that the Petitioner touched his penis but did not tell them the full

---

[1] It is the policy of this court to refer to minors and victims of sexual crimes by their initials.
[2] Due to the procedural nature of this case, we have taken judicial notice of the record from the Petitioner's direct appeal of her convictions.

extent of her actions. See id. The victim said that he told multiple other people about the abuse, including his stepbrother and a guardian ad litem, but that nothing was ever done. See id. In 2008, the victim graduated from high school and moved to Kansas City, where he met his first girlfriend. Id. at *7. He told his girlfriend about the abuse in late 2009, and the Murfreesboro police contacted him about an investigation in 2012. Id.

On cross-examination, the victim acknowledged telling a DCS counselor that nothing inappropriate ever happened with the Petitioner. Id. The victim said he told the counselor that the allegations were false because the Petitioner had told him that she would go to jail if he revealed the abuse to DCS. Id. He said that after he graduated from high school, he and M.W. briefly discussed the allegations and that both of them "expressed relief that the abuse had ended." Id. The victim denied telling M.W. or their paternal aunt that he made up the allegations. See id.

On redirect examination, the victim testified that he told his father about the abuse but that his father initially did not believe him. Id. Eventually, the victim's father thought he was telling the truth. Id.

The Petitioner testified that she began divorcing her children's father in 1996. Id. at *8. She said that in 1997, he was awarded custody of their three sons because she was a Jehovah's Witness. Id. at *8. A.V.W. ended up going to live with her father and brothers in 2003, and the Petitioner moved to Oregon in 2005 due to the victim's allegations. Id. In 2012, the Petitioner learned about a warrant for her arrest for rape of a child, returned to Tennessee, and turned herself in to law enforcement. Id. On cross-examination, the Petitioner denied sexually abusing the victim and said that she loved her children. Id. She said she thought the victim made up the allegations against her because he had been "'manipulated'" by his father "'all of these years.'" Id.

The victim's paternal aunt testified for the Petitioner that in late 2010 or early 2011, the victim told her that "'he wished he had never said those things about [the Petitioner]'" and that the allegations were "'not true.'" Id. M.W. testified for the Petitioner that when he was nineteen years old, he and the victim discussed the victim's allegations and that the victim "expressed regret about 'having to uphold the lies that [their father] told [the victim] to tell.'" Id. M.W. acknowledged, though, that the victim never specifically said the allegations against the Petitioner were false. See id. On cross-examination, M.W. testified that the Petitioner's home was "pleasant and structured" and that he preferred living with her rather than his father. Id. However, M.W. said that the Petitioner "'ran a tight ship'" and that she would use her hand, a wooden spoon, or a switch to "'spank'" her children. Id. M.W. said that he did not think the Petitioner "'sexually molested or raped'" the victim and that he never saw the Petitioner behave in a manner that was consistent with the charges. Id. The State questioned M.W. about prior statements he made to a therapist

regarding sexual abuse. Id. at *9. M.W. claimed he did not remember making the statements. Id.

Linda Arbaugh-Patin, M.W.'s psychotherapist, testified on rebuttal for the State about statements M.W. made to her during their therapy sessions. M.W. told Ms. Arbaugh-Patin that he saw the Petitioner holding the victim's "'privates'" and "'playing with'" the victim's penis. He also told her that he saw the Petitioner and the victim "'all hugged up with arms and legs wrapped around each other'" in bed and that the Petitioner tickled his own "'private parts'" when he was eight or nine years old. Id. M.W. expressed anger and frustration toward the Petitioner, telling Ms. Arbaugh-Patin that the Petitioner "'denies everything'" even though "'I have seen it with my own [eyes].'" Id. at *10. He also told her that the Petitioner stopped touching his penis but started undressing in front of him when he was eleven years old and that she did not stop touching the victim or their brother, J.W. Id. Ms. Arbaugh-Patin said M.W. claimed that the Petitioner and the victim slept together in the Petitioner's bed and that the victim seemed to enjoy sleeping with Petitioner. Id. M.W. also claimed that the Petitioner used to sleep with A.V.W. but that the Petitioner stopped sleeping with her and slept only with the victim, which M.W. thought was "'weird.'" Id.

The victim's girlfriend testified on rebuttal for the State that the victim revealed the sexual abuse to her when she attempted to perform oral sex on him. Id. at *11. She said the victim "'freaked out'" and told her that the Petitioner "'would do stuff . . . like oral sex." Id. At the conclusion of her testimony, the jury found the Petitioner guilty of six counts of rape of a child as charged in the indictment. Id. After a sentencing hearing, she received a twenty-year sentence for each conviction with partial consecutive sentencing for an effective sentence of forty years to be served at one hundred percent. Id.

On direct appeal of the Petitioner's convictions to this court, she claimed, in relevant part, that the evidence was insufficient to support the convictions due to "'inconsistencies'" in the victim's testimony and that the trial court erred by allowing Ms. Arbaugh-Patin to testify about statements made by M.W. Id. at *11, 13. This court found that the evidence was sufficient and that Ms. Arbaugh-Patin's testimony was admissible as prior inconsistent statements to impeach M.W.'s credibility. Id. at *12, 14.

The Petitioner did not file an application for permission to appeal to our supreme court but filed a pro se petition for post-conviction relief in which she claimed that she received the ineffective assistance of trial counsel. Relevant to this appeal, the Petitioner asserted that trial counsel should have called her daughter, A.V.W., to testify because "[t]he record of [A.V.W.'s] ever changing statements about alleged acts of abuse showed indications of coaching. Had [A.V.W.] been allowed to testify she could have offered clarification to the varying statements and possibly refuted testimony from either [the

- 4 -

victim] or [M.W.]." The petition does not bear a file-stamp date, but the Petitioner stated in the petition that she was delivering it to prison authorities for mailing on September 18, 2018. The petition reflects that she signed it in the presence of a notary on that date.

The post-conviction court appointed counsel, and post-conviction counsel filed an amended petition. In the amended petition, the Petitioner maintained that trial counsel "failed to investigate and advance the testimony of certain witnesses," including A.V.W.

At the evidentiary hearing, the Petitioner testified that she moved to Portland, Oregon, in 2005. The trial court appointed lead trial counsel to represent her in 2012, and most of their communication occurred on the telephone. The Petitioner awaited trial for three years but did not have much "phone contact" with lead trial counsel during that time. She estimated that she spoke with lead counsel or co-counsel ten times and said that she would not speak with them for five or six months. The State made plea offers to the Petitioner, and trial counsel told her about the offers. However, the Petitioner had questions about the offers that trial counsel were not able to answer "clearly." For example, the Petitioner wanted to know if she could serve her probation in Oregon, if she could keep her job there, and if she could pursue obtaining guardianship of J.W. Trial counsel's inability to answer the Petitioner's questions about the plea offers affected her decision to go to trial. The Petitioner said that the sexual abuse allegations had been made against her for "many, many years" and that "[t]he truth was always revealed" but that trial counsel "seemed like they were more interested . . . in just getting some kind of plea."

The Petitioner testified that the weekend before trial, she met with trial counsel about four hours to prepare for her trial testimony. Her husband, her mother, her former sister-in-law, and M.W. also were present. The Petitioner told trial counsel that A.V.W. could offer important testimony for the defense, but trial counsel did not call A.V.W. to testify. The Petitioner said that her children "knew that this never happened" and that the victim and A.V.W. even talked about trying to avoid the trial by going to Arizona. A.V.W. was in the courtroom during the trial, and trial counsel knew she was present.

On cross-examination, the Petitioner acknowledged that trial counsel were available if she wanted to "reach out" to them by telephone. She also acknowledged that she had been charged with sexual abuse offenses involving A.V.W. and that A.V.W. was not present during the meeting for trial preparation.

A.V.W. testified that she offered to testify for the Petitioner and that she was in the courtroom for the Petitioner's trial. She said that if trial counsel had called her to testify, she would have told the jury that the victim was making up the allegations against the Petitioner because their father "told us exactly what to say and who to say it to all our lives. So, I know his position." She said the victim was not credible because "I grew up with

him.  Or I grew up with my mom with him around all the time.  So, I would have absolutely known if it was going on or not."  A.V.W. stated that she and her siblings had "no choice because of dad" and that the victim decided to "just stick with it" at trial.  A.V.W. told the victim, "I can't do that."

A.V.W. testified that she heard the victim deny the allegations "[m]any times" in private conversations away from their parents.  Other people, including M.W. and their paternal aunt, also heard the victim deny the allegations.  A.V.W. acknowledged that M.W. was truthful and credible at trial.  She said that she would have been "terrified" to testify for the Petitioner but that she would have done so because the Petitioner's "life was on the line."

On cross-examination, A.V.W. testified that she was eighteen years old at the time of the Petitioner's trial and twenty-three years old at time of the evidentiary hearing.  A.V.W. met with the assistant district attorney one time to prepare for trial.  The victim also was present.  A.V.W. acknowledged that she never told the prosecutor the allegations were untrue.  A.V.W. explained that at that time, she had "just come out of foster care," that she was "still terrified" of her father, and that her father was present at the district attorney's office during her meeting with the prosecutor.  A.V.W said she was not honest with the prosecutor because "I had no other options.  I was being blackmailed the entire time."  She stated that by "blackmailed," she meant that her father had told her that the Petitioner was going to obtain guardianship of J.W.  A.V.W. did not want to be separated from J.W., so she did what her father told her to do and did not reveal the truth.  A.V.W. said that she had wanted to tell the prosecutor the truth but that she was afraid "it would get back to [her] dad."

A.V.W. identified two statements she wrote in 2012, containing allegations of sexual abuse by the Petitioner against A.V.W. and J.W.  A.V.W. also gave video-recorded statements about the abuse to the police.  A.V.W. began seeing Ms. Arbaugh-Patin when A.V.W. was seven years old.  The victim was fourteen years old, and M.W. was twelve years old.  A.V.W. acknowledged that the three of them gave consistent statements about the abuse to the therapist.  She explained, "We were all told what to say in the same room before we went in.  We had it down pretty pat."  A.V.W. said that their father would talk to Ms. Arbaugh-Patin "before our session and afterwards to see what we said to her to see what he needed to say to us."

A.V.W. testified that the sexual abuse allegations were her stepmother's idea and that A.V.W.'s father "kind of followed through with it."  A.V.W. said that one time, she spoke with a different psychologist and told the psychologist that her stepmother had "slapped" M.W.'s face and had cut his cheek.  When A.V.W.'s stepmother found out, she "beat" A.V.W., and A.V.W. never saw that psychologist again.  A.V.W. stated, "So, I

learned very quickly not to actually tell the truth about what was really going on with me." A.V.W. acknowledged that even after the Petitioner's trial, A.V.W. did not contact the police or anyone at the district attorney's office to report that the allegations were not true. A.V.W. said that she had been in contact with the Petitioner "throughout" the Petitioner's incarceration and that she spoke with post-conviction counsel one or two months before the evidentiary hearing. On redirect examination, A.V.W. testified that if trial counsel had called her as a witness at trial, she would have felt "safe enough to explain why we even said this in the first place" and that she would have "set the record straight."

Upon being questioned by the post-conviction court, A.V.W. testified that she went into foster care after a fight in her father's home when she was sixteen years old. A.V.W. told people in foster care that her father shaved her head and "was beating on us." She said that at that time, she was "just a complete wreck" because she was "terrified of the trial coming up." She stopped eating, pulled out her hair, and threatened to kill herself. She stated that she needed a mother when she was growing up and that "it would be really nice to have [the Petitioner] in my life without having to pay to talk to her." A.V.W. said that she had not spoken with the victim since 2015 and that she had not spoken with her father in several years.

M.W. testified that he met with trial counsel "no longer than 10 minutes" the day of the Petitioner's trial and that trial counsel told him, "[H]ere is how we're going to angle your defense. You were a kid. You don't remember anything. And that's what I want you to say . . . I do not recall to everything that the Prosecution asks you." Therefore, when the State began impeaching M.W., he was afraid to "speak [his] mind" and could not say "what actually took place" during his counseling sessions with Ms. Arbaugh-Patin. M.W. said that his father and stepmother drove him and his siblings to their counseling sessions with Ms. Arbaugh-Patin, that his father and stepmother "sat outside the door the entire session," and that the children did not know if their father and stepmother could hear them speaking with the therapist. M.W. said that he and his siblings did not feel "safe and comfortable" and that they "basically just confirm[ed]" what their father and stepmother had already told Ms. Arbaugh-Patin. The children knew they had to go home with their father and stepmother, so they did what they had to do to "keep peace at home." M.W. stated, "Because if we didn't, all hell would break loose." M.W. said that he did not lie at the Petitioner's trial but that "I just didn't elaborate as much as I could have, because my legal counsel told me not to."

Patrick Montgomery, the Petitioner's husband, testified that the Petitioner met with trial counsel on Monday afternoon before her Tuesday trial in order to prepare for trial. Mr. Montgomery was present for part of the meeting. He said trial counsel "were more interested in a plea than a trial." The Petitioner told trial counsel, "I'm not going to plead guilty for something that I didn't do."

Lead trial counsel testified that he had been licensed to practice law for twenty years, that he had worked for the public defender's office for eighteen or nineteen years, and that he was appointed to represent the Petitioner. At the time of the Petitioner's trial, she was living in Oregon. The Petitioner came to Tennessee for court dates, and she and lead trial counsel discussed the case in person. They also talked about the case over the telephone, but the Petitioner and lead trial counsel mainly talked about the case "face-to-face." The Petitioner could telephone lead trial counsel if she needed to speak with him.

Lead trial counsel testified that the Petitioner received plea offers from the State, that he communicated the offers to her, and that he "felt she was clear on what the offer was and what the circumstances were and what her exposure was." Lead trial counsel said that he even "typed it out, . . . what her offer was, what probation was, what diversion was, all of that. We wrote that out and went over it with her more than once, I'm sure." The Petitioner and trial counsel discussed what would happen if she received a sentence involving probation, and the Petitioner knew that she would have to go to prison if the jury convicted her at trial.

Lead trial counsel testified that at some point, A.V.W. made "allegations" against her father. She was put into a group home and sent a message to lead trial counsel through her family that she wanted to talk with him "about what happened." Lead trial counsel said that he and co-counsel went to Kentucky to speak with A.V.W. "because she's evidently wanting to talk to us about the trial." When they met with her, though, "all she would say is that everything I have told the detectives is true." Trial counsel then stated as follows:

> And I asked her, well, why did you want me to come up here just to tell me that? Because we have driven up here to get whatever it is you want to say. And she said over and over, everything I have said about my mother is true.

> So, calling her as a witness at trial was not an option. She showed up during the trial. Not before it. We never had a chance to prepare her. And we would not have prepared her. We would not have called her as a witness.

Lead trial counsel acknowledged that the discovery in the Petitioner's case was "voluminous" and included video-recorded interviews of A.V.W. and handwritten statements in which A.V.W. "detail[ed] specific allegations" of sexual abuse by the Petitioner. Lead trial counsel also acknowledged that he made a strategic decision not to call A.V.W. to testify.

Lead trial counsel testified that he and co-counsel "divided up the witnesses" and that they prepared each witness individually. Co-counsel prepared M.W. to testify. Lead trial counsel said that he and co-counsel had worked together on other cases and that neither of them had ever told a witness to answer every question by the prosecutor with "I do not recall."

On cross-examination, lead trial counsel testified that the victim had recanted his allegations in the past. Lead trial counsel also learned that A.V.W. had recanted her allegations to an attorney in Kentucky. The Kentucky attorney had been appointed as guardian ad litem for J.W., who was disabled. Lead trial counsel spoke with the attorney, and the attorney "confirmed" that A.V.W. had recanted her allegations. About one month before the Petitioner's trial, lead trial counsel filed a motion to continue the trial so that the attorney could testify for the Petitioner.[3] However, the attorney was "never . . . willing to come testify" or help the defense. Lead trial counsel noted that A.V.W.'s allegations had "gone back and forth" and that her recantation to the attorney was "not the only time she recanted her testimony or changed her story by any means."

Lead trial counsel acknowledged that the Petitioner told him that A.V.W. was able and willing to testify. Lead trial counsel did not attempt to talk with A.V.W. again, though, because "[w]e had already made the decision she was not going to be called. . . . [Her] position changed daily almost. And it was just impossible to predict what she would testify to." Lead trial counsel said that M.W.'s "position . . . was always the same. He had recanted, it never happened, they had made it up." In contrast, "there was no way to know what [A.V.W.] was willing to do and what she wasn't willing to do." Therefore, even though M.W. and A.V.W. were both willing to testify for the Petitioner, the defense called only M.W. Lead trial counsel acknowledged that the State ended up impeaching M.W. with his counseling records. Lead trial counsel said co-counsel would not have advised M.W. to lie.

On redirect examination, lead trial counsel testified that he and co-counsel went to Kentucky to meet with A.V.W. "well before the trial." At that time, A.V.W. was living in a children's group home. Prior to living there, trial counsel could not speak with her because she was living with her father. During trial counsel's meeting with A.V.W. in Kentucky, employees from Kentucky DCS also were in the room.

Lead trial counsel acknowledged that at trial, the victim admitted recanting his allegations of sexual abuse. Therefore, trial counsel could not introduce extrinsic proof of

---

[3] Post-conviction counsel introduced the motion to continue into evidence at the evidentiary hearing. According to the motion, lead trial counsel thought the attorney's testimony would be "absolutely necessary" to rebut A.V.W., who was on the State's witness list.

his inconsistent statements. M.W. denied making inconsistent statements, so the State was able to impeach him with his statements to Dr. Arbaugh-Patin.

On recross-examination, lead trial counsel testified that Tennessee Detectives Tommy Roberts and Wayne Lawson also were present during trial counsel's meeting with A.V.W. in Kentucky. The detectives were not in the interview room but were "listening or something." Lead trial counsel stated, "It was clear that [A.V.W.] knew they were there." A.V.W. told lead trial counsel that everything she said to the police was true.

Post-conviction counsel introduced into evidence an affidavit prepared by the Kentucky attorney who was appointed as guardian ad litem for J.W. In the affidavit, which was signed by the attorney in February 2020, the attorney stated as follows: In 2011, he was appointed to prepare a report regarding J.W. because J.W.'s father and the Petitioner were both seeking guardianship and conservatorship of the seventeen-year-old child. The attorney "consulted all pleadings and documentation" related to the Petitioner's divorce from J.W.'s father and interviewed witnesses, including the Petitioner, A.V.W., M.W., and J.W.'s father and stepmother. The attorney then prepared s report in which he stated that J.W.'s father had made numerous accusations of sexual abuse against Petitioner. The attorney concluded in the report that "'these accusations border on caricature and none of these accusations appear to have been substantiated.'" The attorney recommended in the report that the Petitioner be appointed as J.W.'s guardian and conservator.

The post-conviction court filed a written order in which it granted the petition for post-conviction relief, concluding that trial counsel's "failure to adequately investigate the possibility of an exculpatory witness fell well below the reasonable standard of practice that must be afforded." The post-conviction court noted that the State's case "came down to a credibility determination" between the victim and M.W. The court then stated,

> As the only real defense to the allegations was one child denying the testimony of the other child, counsel fell well below reasonably effective assistance by not ascertaining what the third child who had also recanted the same allegations would have testified to at trial. Counsel's initial investigation was wholly lacking. [Lead trial counsel] did not revisit the witness outside the view of the detectives to whom the minor child had spoken to while under the direct influence of the father; counsel did not interview the child after she reached the age of majority; finally, counsel failed to interview the witness at the Petitioner's insistence that [A.V.W.] testify when [A.V.W.] had reached the age of majority, and was no longer dependent on the father or the foster system. "Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them, in a proper and timely [manner]," and in this case, counsel

- 10 -

failed to do so. [Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975) (quoting Beasley v. United States, 491 F.2d 687 (6th Cir. 1974) (emphasis added))].

Thus, the post-conviction court determined that trial counsel were deficient. Regarding prejudice, the post-conviction court stated that "[h]ad [A.V.W.] been available to testify, to attack the credibility of [the victim] along with [M.W.], it is wholly probable the jury would have found in favor of the Petitioner." The post-conviction court, which also presided over the Petitioner's trial, stated that its confidence in the outcome of the case had been sufficiently undermined and, therefore, concluded that the Petitioner received the ineffective assistance of trial counsel.

## II. Analysis

The State contends that the post-conviction court should have summarily dismissed the petition for post-conviction relief and that the post-conviction court erred by considering the petition on its merits because the petition was untimely. The State also contends that the post-conviction court incorrectly determined that the Petitioner received the ineffective assistance of trial counsel. The Petitioner argues that the State has waived the statute of limitations issue because the State failed to raise it in the lower court and, in the alternative, that she is entitled to an evidentiary hearing to determine the circumstances surrounding the untimely filing and whether due process tolled the statute of limitations. The Petitioner also argues that the post-conviction court correctly ruled that she received the ineffective assistance of trial counsel. The State responds that the post-conviction statute of limitations is not an affirmative defense that can be waived and that the Petitioner is not entitled to an evidentiary hearing because she did not allege facts in her petition that would justify due process tolling. We conclude that based on the unique circumstances of this case, an evidentiary hearing regarding the statute of limitations is warranted.

Tennessee Code Annotated section 40-30-102(a) provides, in pertinent part, that a petition for post-conviction relief must be filed within one year of the date on which the final action of the highest state appellate court to which an appeal was taken. "Given the post-conviction statute's language conferring jurisdictional import to the timely filing of a petition, it is essential that the question of timeliness be resolved before any adjudication on the merits of the petitioner's claims may properly occur." Antonio L. Saulsberry v. State, No. W2002-02538-CCA-R3-PC, 2004 WL 239767, at *1 (Tenn. Crim. App. at Jackson, Feb. 9, 2004) (citing Tenn. Code Ann. § 40-30-102(b) (2003)).

Here, this court filed its opinion affirming the Petitioner's convictions on September 1, 2017. The Petitioner did not file a Rule 11 application for permission to appeal to our supreme court. Therefore, she had until September 1, 2018, to file a petition for post-conviction relief. See Tenn. Code Ann. § 40-30-102(a); Dedrick Wiggins v. State, No.

W2020-00095-CCA-R3-PC, 2020 WL 7233127, at *2 (Tenn. Crim. App. at Jackson, Dec. 8, 2020) (recognizing that the statute of limitations for filing a petition for post-conviction relief begins to run when this court files its direct appeal opinion if the petitioner does not file an application for permission to appeal to the Tennessee Supreme Court). According to the pro se petition, the Petitioner submitted it to prison authorities for mailing on September 18, 2018. In the petition, the Petitioner stated that her petition was timely because the one-year statute of limitations did not begin to run until the sixty-day period for filing an application for discretionary appeal to our supreme court expired, which was October 31, 2017. See Tenn. R. App. P. 11(b). However, the sixty-day time period for filing a Rule 11 application for permission to appeal does not toll the statute of limitations. See State v. Kevin Womack, No. W2013-02288-CCA-R3-PC, 2014 WL 5502426, at *2 (Tenn. Crim. App. at Jackson, Oct. 31, 2014). Thus, the petition was untimely. The statute of limitations for filing a post-conviction petition is jurisdictional; therefore, it is not an affirmative defense that must be asserted by the State. See Tenn. Code Ann. § 40-30-102(b); State v. Nix, 40 S.W.3d 459, 464 (Tenn. 2001). Accordingly, we conclude that the State has not waived the statute of limitations as a defense.

Despite the one-year statute of limitations, a post-conviction court may still consider an untimely petition if (1) a new constitutional right has been recognized; (2) the petitioner's innocence has been established by new scientific evidence; or (3) a previous conviction that enhanced the petitioner's sentence has been held to be invalid. Tenn. Code Ann. § 40-30-102(b). This case does not fall within those three exceptions.

A court may also consider an untimely petition if applying the statute of limitations would deny a petitioner due process. Burford v. State, 845 S.W.2d 204, 209-10 (Tenn. 1992). Specifically, our supreme court has identified the following three circumstances in which due process requires tolling the statute of limitations: (1) when the claim for relief arises after the statute of limitations has expired; (2) when the petitioner's mental incompetence prevents compliance with the statute of limitations; and (3) when the petitioner's attorney has committed misconduct. Id. at 623-24. Our supreme court has explained that

> [a] petitioner is entitled to due process tolling upon a showing (1) that he or she has been pursuing his or her rights diligently, and (2) that some extraordinary circumstance stood in his or her way and prevented timely filing. . . . [T]he second prong is met when the prisoner's attorney of record abandons the prisoner or acts in a way directly adverse to the prisoner's interests, such as by actively lying or otherwise misleading the prisoner to believe things about his or her case that are not true.

- 12 -

In terms of diligence, courts have recognized that due diligence "does not require a prisoner to undertake repeated exercises in futility or to exhaust every imaginable option, but rather to make reasonable efforts. . . . Moreover, the due diligence inquiry is an individualized one that must take into account the conditions of confinement and the reality of the prison system."

Whitehead v. State, 402 S.W.3d 615, 631 (Tenn. 2013) (citations omitted). As this court has explained,

[I]f we conclude that a post-conviction court did not have jurisdiction to consider a petition for post-conviction relief because it was untimely and due process did not require the tolling of the statute of limitations, this Court must dismiss the appeal even if the State did not raise the statute of limitations, and the post-conviction court treated the petition as timely.

Stephen Willard Greene v. State, No. E2005-02769-CCA-R3-PC, 2007 WL 1215022, at *5 (Tenn. Crim. App. at Knoxville, Apr. 25, 2007).

In Ugenio Dejesus Ruby-Ruiz v. State, No. M2017-00834-CCA-R3-PC, 2018 WL 1614054, at *1 (Tenn. Crim. App. at Nashville, Apr. 3, 2018), this court affirmed the petitioner's judgments of conviction, and the petitioner filed an untimely application for permission to appeal to our supreme court. The petitioner also filed a motion to accept the late-filed application, but the supreme court declined to waive the time limit and dismissed the application. Id. Subsequently, the petitioner filed a pro se petition for post-conviction relief and a motion to late-file the petition. Id. The post-conviction court concluded that the petitioner's post-conviction petition was timely because it was "'filed within the statute of limitations based on 'the Tennessee Supreme Court's denial of the [P]etitioner's Rule 11 application.'" Id. The post-conviction court then addressed the petitioner's claims of ineffective assistance of counsel and entered an order denying relief. Id. On appeal, the parties did not address the statute of limitations issue and whether due process required tolling. Id. at *3. This court, noting that the issue was not raised at the evidentiary hearing, concluded that the petition was untimely. Id. However, this court further concluded that based on the record before the court, it was unable to determine whether due process required tolling. Id. Therefore, this court remanded the case to the post-conviction court for a determination of the issue. Id.

We agree with the reasoning of the Ruby-Ruiz court that "[w]hat ramifications, if any, appellate counsel's representation may have had on the issue of the statute of limitations awaits further development of the record before the post-conviction court." Id. at *3. In this case, the Petitioner filed her pro se petition for post-conviction relief just seventeen days after the statute of limitations expired. The post-conviction court, the State,

and the Petitioner proceeded as if the petition were timely, and the post-conviction court addressed the petition on its merits. Moreover, this case is unique in that the post-conviction court granted post-conviction relief. If we summarily dismiss the petition, the Petitioner will have to serve an effective forty-year sentence at one hundred percent when the post-conviction court has determined that she received the ineffective assistance of counsel at trial. The effective assistance of counsel has been said to be "a defendant's most fundamental right." Hellard v. State, 629 S.W.2d 4, 7 (Tenn. 1982) (citing United States v. Butler, 504 F.2d 220, 223 (D.C. Cir. 1974)). Therefore, we conclude that under the unique facts of this case, the Petitioner should at least be afforded an opportunity to develop the record further so that the post-conviction court can determine whether the limitations period should be tolled based on due process concerns. Accordingly, we remand this case for an evidentiary hearing. If the post-conviction court determines that the Petitioner has failed to carry her burden of proof as to tolling, then the post-conviction court must dismiss the petition for lack of jurisdiction.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, the case is remanded to the post-conviction court for further proceedings consistent with this opinion.[4]

_____
NORMA MCGEE OGLE, JUDGE

---

[4] Because we have ordered an evidentiary hearing, we will not address the issue of ineffective assistance of trial counsel at this time.